Roderick D. **RUSSELL** and Richard Castoreno, Appellants,

v.

**UNITED STATES**, Appellee.

**Nos. 12–CM–123, 12–CM–124.**

District of Columbia Court of Appeals.

Argued Feb. 27, 2013.

Decided May 16, 2013.

---

Lisa Schopler Resnikoff for appellant Roderick D. Russell.

Edward E. Schwab for appellant Richard Castoreno.

Peter S. Smith, Assistant United States Attorney with whom Ronald C. Machen Jr., United States Attorney, and Elizabeth Trosman, Chrisellen R. Kolb, and Kevin A. Chambers, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, BLACKBURNE–RIGSBY, Associate Judge, and FERREN, Senior Judge.

FERREN, Senior Judge:

After a bench trial, appellants Roderick Russell and Richard Castoreno were each convicted on one count of second-degree theft[1] and malicious destruction of property (MDP).[2] Both convictions were attributable to appellants' removal and sale of surplus telephone cable from the Federal Aviation Administration (FAA) building, where they had worked as temporary employees of an independent contractor. Russell and Castoreno each received concurrent 180–day sentences of incarceration on each count, all suspended, followed by one year of supervised probation. Appellants filed timely notices of appeal, challenging their convictions for insufficient evidence and for alleged trial court error in quashing the subpoena of a defense witness.

As to the theft we affirm, rejecting appellants' respective contentions that the evidence was insufficient for conviction. The evidence supported the trial court's finding that at the time they cut, removed, and sold the telephone cable, appellants each lacked a reasonable belief that they had the required authority to do so. We also affirm appellants' MDP convictions, concluding that the evidence was sufficient to prove that they destroyed FAA telephone cable with "malice," as properly defined. Finally, we conclude that the trial court did not abuse its discretion in quashing the defense subpoena. The proffered testimony would not have materially aided appellants' defenses and, in any event, would have been cumulative of other defense testimony.

## I.

The following statement of facts is attributable to the testimony of appellants and other witnesses from which the trial court made its findings (part II. below), including resolution of the mental states pertinent to the charges at issue.

---

1. D.C.Code § 22–3211(b) (2001) provides:
 A person commits the offense of theft if that person wrongfully obtains or uses the property of another with intent: (1) To deprive the other of a right to the property or a benefit of the property; or (2) To appropriate the property to his or her own use or to the use of a third person.

2. D.C.Code § 22–303 (2012 Supp.) provides:
 Whoever maliciously injures or breaks or destroys, or attempts to injure or break or destroy, by fire or otherwise, any public or private property, whether real or personal, not his or her own, of the value of $1,000 or more, shall be fined not more than $5,000 or shall be imprisoned for not more than 10 years, or both, and if the property has some value shall be fined not more than $1,000 or imprisoned for not more than 180 days, or both.

 The government dismissed an unlawful entry charge against each defendant.

Appellants had worked as temporary communication technology employees of Information Innovation, Inc. (I.I.I.), a contractor for telecommunications services to the U.S. Department of Transportation (DOT), the parent agency of the FAA. Their last day of work was April 15, 2011, after which they were no longer authorized to enter the FAA building. During the week after their job ended, both appellants were living with Dan Hall, a manager for I.I.I., who brought them back to the FAA building on April 19 to meet with Merryll Campbell, a management analyst in charge of telecommunications for the FAA and I.I.I.'s main contact there. Campbell offered appellants an opportunity to cut and remove surplus telephone cable from the FAA building and to sell it at a recycling center. When both appellants expressed concern "about being seen in the building," Campbell replied, "just say you work for me." As to compensation, Hall testified that the participants agreed to split the proceeds, less an unspecified share for Campbell.

Appellants then met with Dan Griffith, an independent contractor who worked at the FAA building and showed them the cable that could be removed. (Griffith, Campbell, and an I.I.I. representative had marked cable for removal a few months earlier.) Griffith gave appellants access to the telecommunications closets and told them that Charles Clayton, another independent contractor (and Griffith's father-in-law), had previously removed cable.[3] Appellant Castoreno therefore asked Clayton to help haul away the cable that he and Russell were to cut. Clayton understood that appellants would test, then cut, the cable, and that he would assist in loading the cable into his truck for transport to the recycling center. Without mentioning Campbell's name, appellants told Clayton that they had received the required authorization from their supervisors.

On April 20 and 21, appellants, Clayton, and Clayton's assistant, Jeffrey Patterson, cut and hauled away cable, with Clayton collecting the group's money from the recycling center. Neither appellant was secretive in doing so. On Saturday, April 23, Griffith signed the group into the FAA building between 6:00 and 6:30 a.m. to finish the job. Altogether, appellants cut and removed from the walls and ceiling of the FAA garage approximately 300 feet of heavy gauge aluminum conduit (pipe) containing 900 pairs of copper wiring—including (to their later surprise) some wires that had been live when cut. Appellant Castoreno had borrowed equipment to test the cable, and appellants cut and removed what they thought was dead cable.

After appellants and Clayton delivered this last haul to the recycling center, Clayton took $100 of the sale proceeds to cover his cost of equipment. He then gave half the remaining proceeds to Castoreno and kept the other half for himself and Patterson. Appellants never gave the expected sum to Campbell. For all their hauls, Castoreno and Russell each received between $1,400 and $1,500.

On Monday, April 25, workers discovered a widespread telephone outage at the FAA affecting approximately 1,500 employees and eventually costing approxi-

---

**3.** For two years, Clayton had hauled trash for the FAA pursuant to a verbal contract with Bradford Twinum, the General Services Administration (GSA) supervisor at the FAA building. In this arrangement, Clayton did not charge for any item he could sell but did charge a hauling fee for the rest. The trial court found that "whenever [Clayton] recycled something, [he] had to bring a receipt back to the FAA ... that showed that [he] didn't just take the property" but that he "actually recycled it." There was no provision for sharing any of the proceeds with a supervisor.

mately $38,000 to repair. Campbell denied knowing the source of the outage but testified that he had discovered several severed telephone cables that had caused the problem. Griffith learned of the outage and met with Campbell, who appeared nervous. Campbell told Griffith and Hall to blame the outage on Clayton.

Special Agent Joshua Henry of the Department of Homeland Security's, Federal Protection Service investigated the telephone outage. He spoke over the phone with Russell, who would not answer whether he had been involved in the "conduit thefts" or had "cut the cable," let alone give the name of the person who had "actually authorized" his participation. Moreover, Russell told Henry that he "did not receive any cash for the ... conduit" but that "Clayton received funds from the scrap metal shop." At trial, however, Russell acknowledged his role. He testified that "removing old cable out of the FAA building" struck him as a "criminal act," unless one had "permission"—which he said he had received from Campbell. He further acknowledged, however, that even after he had struck the agreement with Campbell, it "didn't quite sit right"; he was "concerned that [he] might get in trouble."

Agent Henry also spoke with Castoreno, who said that Clayton and Griffith had given him permission to cut the cable. Castoreno's other responses to Henry reflected inconsistencies, and later Castoreno

admitted to Henry, and in court, that he had prevaricated because he was "scared and nervous," as he had never before spoken with a federal agent. Castoreno further acknowledged at trial that, "after the fact," he felt as though he had "done something wrong."

## II.

### A.

 This court reviews "claims of insufficiency of the evidence *de novo*, applying the same standard as the trial court in ruling on a motion for judgment of acquittal."[4] The court must give "deference to the factfinder's ability to weigh the evidence and make credibility and factual determinations."[5] Furthermore, in a bench trial the court will not reverse "unless an appellant has established that the trial court's factual findings are plainly wrong, or without evidence to support them."[6] Thus, in order to prevail, appellants must establish "that the government presented 'no evidence' upon which a reasonable mind could find guilt beyond a reasonable doubt."[7] However, "[s]light evidence is not sufficient evidence; a 'mere modicum' cannot 'rationally support a conviction beyond a reasonable doubt.'"[8]

### B.

 To establish second-degree theft under D.C.Code § 22–3211(b),[9] the government must prove:

---

**4.** *Otts v. United States,* 952 A.2d 156, 167 (D.C.2007) (citing *Price v. United States,* 746 A.2d 896, 899 (D.C.2000)).

**5.** *Peery v. United States,* 849 A.2d 999, 1001 (D.C.2004) (citing *Lewis v. United States,* 767 A.2d 219, 222 (D.C.2001)).

**6.** *Mihas v. United States,* 618 A.2d 197, 200 (D.C.1992) (internal quotation marks and citation omitted).

**7.** *Peery,* 849 A.2d at 1001.

**8.** *Rivas v. United States,* 783 A.2d 125, 134 (D.C.2001) (quoting *Jackson v. Virginia,* 443 U.S. 307, 320, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

**9.** See *supra* note 1.

(1) that the accused "wrongfully obtained the property of [another], (2) that at the time he obtained it, he specifically intended 'either to deprive [another] of a right to the property or a benefit of the property or to take or make use of the property for [himself] ... without authority or right,' and (3) that the property had some value." [10]

Thus, to be clear: in order to show that the accused took the property "without authority or right," the government must present evidence sufficient for a finding that "at the time he obtained it," he "knew that he was without the authority to do so." [11]

The trial court found both appellants guilty of second-degree theft, characterizing what happened as "an under the table job opportunity" offered by Campbell. The court found, more specifically, that on April 23, 2011, appellants entered the FAA building, "without authority," and cut and removed 300 feet of heavy gauge aluminum conduit, including live wires, resulting in a significant failure of telephone and data services at the FAA. The court further found that appellants wrongfully obtained the FAA property because they "knew, at that moment," that Merryll Campbell "did not have lawful or official authority" to permit these actions. [12] The court derived these findings primarily from subsidiary findings that (1) no forms had been completed to authorize the removal and recycling (whereas Clayton had completed forms to document the recycling as a part of his verbal contract with

GSA); [13] that (2) both appellants had expressed concern about being seen in the building without badges; and that (3) both had lied to Agent Henry without reason—with "nothing to be afraid of ... if they genuinely believed that Campbell had the authority and gave them the authority to remove the cable." The court stressed, in particular, that Russell had refused to acknowledge to Henry that he had cut the cable, that he had been paid, or even that Campbell had authorized the deal; and Castoreno had told Henry that Clayton or Griffith (rather than Campbell) had authorized cutting the wire. Finally, the court found that even though Campbell was supposed to have received a share of the proceeds, Castoreno (who had received appellants' share from Clayton) never paid Campbell because he was aware (in the court's words) that "Campbell wasn't in a position to complain about [the deal] because it wasn't legitimate."

### C.

The issue on appeal, fundamentally, is whether the evidence was sufficient for a finding, beyond a reasonable doubt, that appellants had cut and removed the FAA telephone cable "without authority or right." [14] Appellants contend that the record would not permit that finding because of offsetting evidence that, at the time they took the cable, appellants reasonably believed they had a lawful right to do so based on Campbell's apparent authority to approve the taking. They do not dispute that, in the words of the theft statute, they

---

**10.** *Nowlin v. United States*, 782 A.2d 288, 291 (D.C.2001) (quoting Criminal Jury Instructions for the District of Columbia, No. 4.38 (4th ed. rev.1993)).

**11.** *Peery*, 849 A.2d at 1001.

**12.** More specifically, the court found "that the defendants knew, at that moment, certainly thereafter, but even at that moment, that ...

Mr. Campbell did not have lawful or official authority to ... give them permission to remove the conduit that he ... gave them to remove."

**13.** See *supra* note 3.

**14.** See *supra* text accompanying note 10.

"specifically intended" to take someone else's property or that it had "value."[15] But they contend that "at the time" they cut, removed, and sold the cable, it was not "wrongfully obtained ... without authority or right" because they did not know their actions were unauthorized. To the contrary, they "reasonably believed," based on Campbell's "apparent authority," that Campbell—having top management responsibilities at the FAA—had the necessary authority to permit what they did.

Appellants' argument, therefore, does not rest on the doctrine of implied actual authority, for they do not contend that Campbell had lawful authority to make the particular kind of arrangement they undertook.[16] Rather, appellants invoke the doctrine of apparent authority, maintaining that the FAA (as principal) had put Campbell (FAA's agent) in a position that caused appellants "to reasonably believe the [FAA] had consented to the exercise of authority" that Campbell purported to hold.[17]

Appellants ask us to focus first on the larger context of what happened. They emphasize that the number of individuals involved in the wire cutting operation lends credence to their belief that they had received authorized permission from Campbell to cut the wires. Appellants' former I.I.I. manager, Dan Hall, brought them back to the FAA to discuss a business proposition with Campbell. Appellants knew that Campbell was in charge of

telecommunications in the FAA building and was I.I.I.'s main contact for its work there. Another contractor, Dan Griffith, showed appellants the wires to cut and recommended that Charles Clayton—an independent trash and recycling contractor for the FAA—assist them with hauling the cut cable. Furthermore, the first two days of work were normal work days, and the cutting and hauling took place during normal work hours. All this evidence, appellants argue, shows that it was reasonable for them to believe that Campbell was acting with authority when he gave them permission to cut and haul the surplus wire.

Appellants call our attention to *Stieger*,[18] in which we held a credit card holder responsible to the bank on which funds were drawn for unauthorized charges by a woman who had been given the card to make particular, authorized charges. We concluded that by causing third-party merchants to "reasonably believe" that the card holder (as principal) had "consented to the exercise of authority" that the woman purported to have (as agent), the card holder had clothed the woman with "apparent authority" to make the charges.[19] Pertinent here, appellants argue, the agent bound the principal for the benefit of a third party, just as Campbell exercised FAA's authority to contract with appellants for removal of surplus cable.

Appellants also rely on *Peery*,[20] in which a lawyer was convicted of second-degree

---

**15.** See *supra* notes 1 and 10.

**16.** According to Russell's brief, "Campbell did not have the actual authority to permit appellant and Castoreno to remove the cable from the building."

**17.** *Stieger v. Chevy Chase Sav. Bank, F.S.B.*, 666 A.2d 479, 482 (D.C.1995). We have said that "apparent authority of an agent arises when the principal places the agent in such a position as to *mislead* third persons into be-

lieving that the agent is clothed with authority which in fact he does not possess." *Id.* (emphasis in original) (internal quotation marks omitted) (quoting *Jack Pry, Inc. v. Harry Drazin*, 173 A.2d 222, 223 (D.C.1961)).

**18.** See *supra* note 17.

**19.** *Stieger*, 666 A.2d at 482–83.

**20.** *Peery v. United States*, 849 A.2d 999 (D.C. 2004).

theft after telling his office manager that he had " 'inadvertently' charged 'a couple' of personal expenses to the [firm's credit] card and that he would reimburse the firm." [21] The firm had not announced a policy, written or oral, as to whether a lawyer could or could not use the firm's card for personal purchases, subject to reimbursement; and the lawyer "testified that his use of the card for personal expenses was reasonable based on his experience with an identical card at a prior law firm." [22] We, therefore, reversed the conviction because there were "both innocent and guilty explanations" for his behavior; the evidence was as consistent with mistake as with theft, necessarily making his actions "insolubly ambiguous," creating reasonable doubt.[23] In short, we could not say that the agent had betrayed his principal. Similarly here, appellants argue, absent a limitation on Campbell's apparent authority, as telecommunications manager, to order removal of surplus cable from the FAA, appellants' belief in his authority to arrange for them to do so was reasonable. At worst, they add, the evidence of Campbell's authority and their understanding of its scope was ambiguous and thus subject to reasonable doubt, not to a finding of criminality.

*Stieger* and *Peery* may offer support for appellants' argument that the FAA had clothed Campbell with apparent authority to retain third parties to dispose of surplus cable. But, even assuming Campbell's apparent authority to enter into a cable disposal contract, as such, we cannot say that this general level of authority would embrace more specific apparent authority to contract with a kickback provision, as under Campbell's arrangement with appellants. Accordingly, although we agree with appellants that the doctrine of apparent authority transmutes the knowledge element of the theft statute into a "reasonable belief" criterion,[24] our inquiry narrows to whether appellants reasonably believed (not that they actually knew) that, under all the circumstances—including a kickback contract with Campbell—they had a right to cut and take the cable.

Appellants contend that the trial court's ultimate finding that, at the time they took the cable, they lacked such reasonable belief is premised on erroneous subsidiary findings attributable to facts that, as in *Peery*, "have both innocent and guilty explanations." [25] As to the trial court's finding that no forms had been filled out to authorize removal of the cable, appellants stress that forms had not been filled out for their work at the FAA in the past, and thus that they had no reason to believe that paper work was necessary for recycling surplus cable. Nor, appellants argue, did their concern about being seen in the building without badges necessarily reflect a sense of guilt; that apprehension, they say, can just as easily be interpreted to manifest a concern that their freelance job for Campbell might have jeopardized future employment with I.I.I. Furthermore, appellants maintain that their lies to Special Agent Henry, as well as their refusals to answer certain questions, could as

---

21. *Id.* at 1000.

22. *Id.* at 1002.

23. *Id.*

24. *Compare Peery,* 849 A.2d at 1001(for second-degree theft, government must prove that at time accused obtained property he "knew that he was without the authority to do so")

*with Stieger v. Chevy Chase Sav. Bank, F.S.B.,* 666 A.2d 479, 482 (D.C.1995) (apparent authority permits third person "to reasonably believe the principal had consented to the exercise of authority the agent purports to hold").

25. *Peery,* 849 A.2d at 1002.

easily be evidence of nervous discomfort as of criminality.[26] Such dissembling, they say, could have been triggered as self-protective responses upon hearing for the first time, from the investigation itself, that they may have done something wrong.

Finally, appellants buttress these explanations by reminding us again that the operation took place in the open, during normal working hours, involving several workers in addition to Campbell; that Charles Clayton had been undertaking a similar hauling contract for two years; and that the trial court ignored the testimony of their character witnesses, who established appellants' reputations for truth, veracity, and integrity.

In response, the government essentially echoes the trial court's findings. It emphasizes that appellants' claimed reasonable belief in the lawfulness of their contract with Campbell at the time they agreed to it rings hollow for three principal reasons: their "false statements to the investigator, evidencing their consciousness of guilt"; the "under the table" arrangement with Campbell that included an "undisputed cash 'kickback'"; and appellants' awareness of the crucial distinction between Clayton's hauling arrangement with the FAA and appellants' "kickback" understanding with Campbell.

■ We agree with the government. Despite appellants' efforts to provide innocent explanations for their conduct, including a threshold belief that Campbell had apparent authority to enter into the cable-cutting arrangement with them, we cannot agree that appellants have made their case. We acknowledge the ambiguity of the overall situation that appears from authorization of the arrangement by a top FAA manager, Campbell; from the cooperation by I.I.I. manager Hall and contractors Griffith and Clayton; from the openness of the operation during normal work hours; from the alternative explanations appellants offer for the lack of paper work for the job; and from their concern about functioning on the premises without badges. But we cannot overlook two unassailable and highly relevant facts.

First, both appellants withheld information from investigator Henry and even lied to him. Second, the arrangement included a kickback to Campbell, albeit one that was never paid, but nonetheless a feature that appellants could defend only as an "opportunity cost." Taken together, these facts support the trial court's ultimate—and critical—finding that appellants took the surplus cable "without authority or right" because they "knew[ ] at [the] moment" they agreed to the arrangement that this was an "under the table job opportunity," which Campbell lacked authority to approve. Or, to put the finding in different language, premised on Campbell's apparent authority, in general, to enter into surplus cable disposal contracts: appellants took the cable "without authority or right" because they lacked a reasonable belief, at the time of contracting, that Campbell had authority to make the particular kind of arrangement with them that he did.[27]

---

**26.** *Cf. In re D.P.*, 996 A.2d 1286, 1289 (D.C. 2010) ("It is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses.") (quoting *Alberty v. United States*, 162 U.S. 499, 511, 16 S.Ct. 864, 40 L.Ed. 1051 (1896)).

**27.** Appellants lacked a reasonable belief here because, although Campbell may have had apparent authority, in general, to enter into disposal contracts—as Clayton did with Twinum, see *supra* note 3,—the trial court implicitly found that Campbell lacked apparent au-

Neither appellant ever quite admitted that he knew, at the time of the cutting and removal, that they were doing so without proper authorization. But they came close. As noted earlier, Russell acknowledged at trial that "removing old cable out of the FAA building" struck him as a "criminal act," unless one had "permission"—which he said he received from Campbell. But he further acknowledged that, even after he had struck the agreement with Campbell, it "didn't quite sit right" with him; he was "concerned" that he "might get in trouble." Castoreno similarly acknowledged at trial that, "after the fact"—we don't know exactly when—he felt as though he had "done something wrong." Appellants' acknowledged uneasiness (traceable, it would appear, to initial concern about being seen again at the FAA), their admitted lies to Special Agent Henry, and their agreement that called for a kickback to Campbell comprised evidence sufficient for the trial court's finding (when accorded the required deference)[28] that appellants knew, from the outset, that Campbell did not have lawful authority to permit their taking away FAA property. From that finding and the uncontested elements of the theft statute, we are satisfied that appellants "wrongfully obtained" FAA property, "without authority or right," specifically intending at the time to deprive the FAA of property that the evidence shows had value. Accordingly, the statutory elements of second-degree theft

have been satisfied, and appellants' convictions of that offense must be affirmed.

### III.

The trial court also convicted both appellants of malicious destruction of property, which requires proof beyond a reasonable doubt that the accused "*maliciously* injures or breaks or destroys, or attempts to injure or break or destroy ... any public or private property, whether real or personal, not his or her own, of value."[29]

### A.

Appellant Castoreno seeks reversal on the ground that the evidence was insufficient for a finding of malice because, in the words of his brief, Castoreno's "acts were done pursuant to the agreement that Merryll Campbell made with him.... There can be no crime where the very object of an agreement between the owner and another is to do the acts which constitute the destruction and obtaining of the property. That is the situation here, because Campbell was authorized to make the agreement he had with Castoreno." Furthermore, according to Castoreno, the same is true if Campbell "acted beyond his authority, because Castoreno believed the agreement was valid. In that situation, Castoreno acted by mistake and not with criminal intent."

Castoreno's arguments here must fail. In finding appellants guilty of second-de-

---

thority to enter into a kickback contract. Thus, the concepts of "knowing" Campbell lacked authority and not "reasonably believing" in that authority merge.

**28.** See *supra* part II. A.; *In re S.G.*, 581 A.2d 771, 775 (D.C.1990) ("An appellate court will not redetermine the credibility of witnesses where, as here, the trial court had the opportunity to observe their demeanor and form a conclusion.") (internal quotation marks and citation omitted).

**29.** See *supra* note 2. Neither appellant questions the trial court's finding that they broke FAA property by cutting aluminum conduit (or pipe) containing telephone cable from the garage wall and ceiling and then further cutting the conduit into ten-foot lengths that would fit on the truck headed for the recycling center.

gree theft, we sustained the trial court's findings not only that Campbell lacked authority to enter into the "kickback" agreement with them, but also that neither appellant had a reasonable belief that Campbell had such authority. Accordingly, Castoreno's defense of the MDP charge by reference to Campbell's alleged authority to make the agreement with appellants—or at least by reference to Castoreno's allegedly mistaken belief in that authority—has already been precluded by his second-degree theft conviction. The agreement cannot save him from either conviction.

## B.

Appellant Russell asks for reversal of his MDP conviction on a different ground: that the trial court misapplied the malice element of the statute. The statutory definition of "maliciously injures," informed by our case law, embraces two separable mental states which have not been addressed by the court in a way that explains how the two should be understood. We do so here.

### (1)

■ Thirty-six years ago in the *Charles* case,[30] this court briefly reviewed the common law origins of "malice," as reflected in the offense of "malicious mischief." We noted that malice was both a "man-endangering" and "property-endangering" state

of mind,[31] and that in modern times it had come to be understood as a "particularized form of intent" with two elements: "intentional wrongdoing ... accompanied by a bad or evil purpose" (or "a wicked heart").[32] By this we meant that, for malicious destruction of property, there must be not only the general intent to do the act of destruction itself, but also an enhanced intent to cause the particular harm that ensues.[33]

This split focus on a destructive act and resulting harm embraced the possibility that on occasion the harm could exceed the immediate consequences from the act itself. For example, if someone were to hit a golf ball in a school yard, the act and immediate consequence would be the swing that sends the ball aloft, while the resulting harm would be the damage if the ball were to strike a window. That distinction suggested, in turn, this question: In the culprit's mind, how clearly anticipated must the damage be for a jury to find that the injury to property was maliciously intended?

In answering this question, we warned that "basically awkward terms such as a 'wicked heart' or a 'bad or evil purpose' should not be overemphasized."[34] We determined that more precise language was required, including a formulation that extended malice to consequential harm, such as a *window-breaking golf ball*, as well as

---

30. *Charles v. United States*, 371 A.2d 404 (D.C.1977).

31. *Id.* at 411.

32. *Id.* at 411 & n. 12.

33. Malice is understood differently in other contexts. *Compare Comber v. United States*, 584 A.2d 26, 38–39 (D.C.1990) (en banc) ("malice aforethought" embraces four distinct mental states for murder: "specific intent to kill"; "specific intent to inflict serious bodily harm"; "wanton and willful disregard of an unreasonable human risk"; and the malice

implied by felony murder) *with Mosrie v. Trussell*, 467 A.2d 475, 477 (D.C.1983) (to prove abuse of common interest privilege in defamation action, plaintiff may show defendant published statement with malice, meaning the "equivalent of bad faith," that is, "such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will") (citation omitted).

34. *Charles*, 371 A.2d at 411.

to specifically intended harm. It was obvious, of course, that any definition of malice extending to consequential harm would require an outside limit, akin to foreseeability, and that this definition would accordingly fall somewhere between the general intent required for the destructive act and the specific intent required for consciously intending the particular harm that occurred. In *Charles*, for example, the appellant had stolen a taxicab and, during a high-speed chase by the police, crashed the cab into a parked car. For such circumstances, we said: "a finding that the accused intended the actual harm which resulted from his wrongful act is not an essential prerequisite to the existence of malice. All that is required is a *conscious disregard of a known and substantial risk* of the harm which the statute is intended to prevent." [35]

In affirming appellant's conviction in *Charles* for malicious destruction of stolen property, we adopted the elaborate (and somewhat off–putting) language of the Perkins treatise to express such conscious disregard of risk; and thus we found mal-ice in appellant's " 'wanton or willful doing of an act [*i.e.*, the high-speed flight from the police] with awareness of a plain and strong likelihood' that the harm which in fact occurred (*i.e.*, the wrecking of the stolen vehicle) might result." [36]

But what about a trespasser who marches onto the property of another, cuts down his neighbor's trees, and thus, as part of the act itself, manifests an intention to harm the property, not merely to risk doing so? When the very harm itself, not merely the conduct that generates it, is manifestly the result of intentional conduct, and something more than general intent is required to show malice, an alternative, more descriptive definition was essential. And the logical, next step up from "conscious disregard" was the next "particularized form of intent," [37] namely specific intent.[38]

■ Both the specific intent and conscious disregard states of mind, therefore, are included in the definition of malice that this court applies for MDP review. And both can be found in the standardized jury instructions [39] and in the more formal lan-

---

**35.** *Id.* (emphasis added).

**36.** *Charles v. United States*, 371 A.2d 404, 412 (D.C.1977) (quoting Perkins, Criminal Law 769–70 (2d ed.1969)).

**37.** *Id.* at 411 & n. 12. Perhaps one could say that the "conscious disregard" definition would cover *all* inquiries into malice, on the assumption that "conscious disregard" would describe everyone accused of MDP, not just those whose intentions were elusive or indirect. But "conscious disregard" would seem unsuitable, and thus confusing, when applied to someone who evidently marched next door deliberately, with an axe, to cut down his neighbor's trees.

**38.** In *Carter v. United States*, 531 A.2d 956 (D.C.1987), another case of a vehicle crash after a high-speed police chase, we affirmed MDP convictions, applying *Charles*. The defendant argued that one of the jury instruc-tions was "inherently confusing because it define[d] malice in two different ways," one requiring proof of "intentional wrongdoing with a bad or evil purpose," the other only "a conscious disregard of a known and substantial risk." *Id.* at 962. From that he argued that the instruction appeared to require a specific intent to injure or destroy property which could not be proved against him. This court rejected the argument, stating that "malice is not synonymous with, and does not require, a specific intent to injure or destroy the property." *Id.* In context, the court was saying that in a car crash case, malice can be defined by reference to "conscious disregard"; the government was not required to prove specific intent. The court was not saying that the first prong of the instruction covering "intentional wrongdoing" did not require a finding of specific intent.

**39.** Criminal Jury Instructions for the District of Columbia, No. 5.400 (5th ed. rev.2011),

guage that we adopted in *Charles* and have cited ever since:

> [Malice] in the legal sense imports (1) the absence of all elements of justification, excuse or recognized mitigation, and (2) the presence of either (a) an actual intent to cause the particular harm which is produced or harm of the same general nature, or (b) the wanton and willful doing of an act with awareness of a plain and strong likelihood that such harm may result.[40]

### (2)

After summarizing the elements of the statute by reference to the jury instructions and finding that appellants, "voluntarily and on purpose," had damaged property of "some value" that "was not theirs," the trial court made the following findings as to malice:

> They unquestionably damaged or destroyed ... the conduit in the garage at the building, the FAA headquarters. Did they do so maliciously? To the extent that maliciously has been defined in many cases, but in particular in the *Gonzalez* case,[41] I'm satisfied that they intended to damage and destroy the property that they damaged. I am not finding that they intended the consequences of that damage. That they knew that the cables were live and they

knew, therefore there would be a disruption in service. But I do find that they knew they were removing conduit and cabling that didn't belong to them, that had a real value, a recycling value, and they intended to do harm, that is damage, to the cabling system of the FAA. So I further find that the defendants are guilty of—each of one count of malicious destruction of property. I find that they had no justification, excuse, there's no mitigation in ... the case of destruction of property[,] and that they had no authorization to take the action that they took.

According to Russell, the court's finding that appellants had "intended to damage and destroy the property that they damaged"—while expressly "not finding that they intended the consequences of that damage," that is, "disruption in service"—failed to satisfy the finding of malice required for conviction. We turn to that inquiry.

### (3)

Russell contends that the evidence is insufficient for a finding that he maliciously intended to cause damage to the FAA telephone system because (1) the record shows that appellants took precautions to be sure that they had properly tested the

---

provide: "[T]he elements of the offense of malicious destruction of property, each of which the government must prove beyond a reasonable doubt, are that: (1) [Name of defendant] [damaged or destroyed] ... property ...; (2) The property was not his/her property; (3) S/he acted voluntarily and on purpose, and not by mistake or accident; (4) [Name of defendant] [a] *intended to damage or destroy the property or* [b] *was aware that his/her conduct created a substantial risk of harm to that property but engaged in that conduct nonetheless* ...; (5) [Instruction about value of property]; (6) [Name of defendant] acted without mitigation [as later defined]." (Emphasis added). Earlier iterations of the MDP

instruction incorporated instead the "conscious disregard of a known and substantial risk" language found in *Charles*. *See supra* text accompanying note 36; *Carter, supra* note 39.

**40.** *Charles*, 371 A.2d at 411 (quoting PERKINS, CRIMINAL LAW, at 769–70); *see also (Robert) Thomas v. United States*, 985 A.2d 409, 412 (D.C.2009); *Gonzalez v. United States*, 859 A.2d 1065, 1068 (D.C.2004); *Guzman v. United States*, 821 A.2d 895, 898 (D.C.2003); *(William) Thomas v. United States*, 557 A.2d 1296, 1299 (D.C.1989).

**41.** *Gonzalez*, 859 A.2d at 1068.

cable before cutting it; (2) their cutting of several live wires (among the many cut) was therefore at worst negligence, not an intention "to damage the cable in order to cause the outage," nor a state of mind that "subjectively disregarded a substantial risk of harm to the property"; (3) the court "specifically found" (in the words of Russell's brief) that appellants "did not have an evil intent to harm the system by causing an outage at the FAA"; and thus Russell's only mental state of record for damaging the FAA cabling system was "the general intent to commit the act of cutting the cable," not the statutory state of mind required for malice.

■ The government replies that Russell is proceeding from a faulty premise, namely, that the harm at issue is the outage. Short of that, says the government, the malicious "harm" that concerns us is simply the unauthorized "destruction of the FAA's aluminum conduit and copper wiring, which appellants intentionally cut, removed, and sold," without authority.[42] More specifically, the government takes its argument from the trial court's findings that appellants

intended to damage and destroy the property that they damaged. . . . I do find that they knew they were removing conduit and cabling that didn't belong to them, that had a real value, a recycling value, and they intended to do harm, that is damage to the cabling system of the FAA.

As noted earlier, we must accept the trial court's findings of fact unless "plainly wrong, or without evidence to support them"; however, we review claimed "insufficiency of the evidence *de novo*," as ultimately a question of law.[43]

In light of the trial court's finding that excludes reliance on the "consequences" of the cable-cutting (*i.e.*, the telephone outage), we do not dispute Russell's contention that his MDP conviction cannot rest on a finding of malice attributable to that outage. Nor, even, can that conviction be upheld by reference to the cutting of live wires, which we shall assume was a negligent act.[44] The question then arises, in severing the telephone conduit from the FAA garage wall, cutting it into ten-foot lengths, and (as we have held) stealing it for a recycling profit, did appellants have "an actual intent to cause the particular harm which [was] produced"[45] or, similar-

---

**42.** In the alternative, the government argues that, even if this court were to accept appellants' understanding of the harm at issue (the outage, not the cable cutting), the evidence was sufficient for conviction because the record shows that appellants, by cutting the cable without adequate testing for live wires, acted with malice by "consciously disregard[ing] 'a known substantial risk' of disrupting the FAA's telephone system." This argument is not available to the government because the trial court did not find that appellants intended, or even consciously disregarded, a known substantial risk that severing the cable would cause a power outage.

**43.** See *supra* part II.A.

**44.** The government argues that, viewing the evidence in the light most favorable to the prosecution, the record does not support Rus-

sell's contention that appellants carefully tested the wiring before cutting. While acknowledging that the trial court "did not make an express finding" about the alleged testing, the government contends that the evidence supporting the defense on testing is "equivocal" at best, permitting a finding that "appellants consciously disregarded a significant risk of damage to the FAA's communications." This court, however, does not make findings; that is the work of the trial court. Absent any finding on the degree of care appellants exercised before cutting the wires, we cannot take into account, even if relevant, the fact that some of the cut wires were live ones.

**45.** *Charles v. United States*, 371 A.2d 404, 411 (D.C.1977).

ly, an intent "to damage or destroy the property"? [46]

 Russell argues that in taking these steps of destruction—and absent a finding of intent to cause the power outage—he was guided by no more than the general intent to cut the cable. What more intent, he asks, can there have been? If we revert to language essentially rejected in *Charles*, but resurrected in later opinions, the answer would be simple: Russell's general intent was accompanied by the "bad or evil purpose" [47] of severing and cutting the conduit in order to steal it. But that kind of transcendent purpose is not required. In the words of the PERKINS definition that we adopted in *Charles*,[48] as well as those of the standard jury instruction that offers more agreeable English,[49] it is clear that specific intent to damage another's property with some value—and without justification, excuse, or mitigation—is enough. And without doubt we have that specific intent here.

One case will suffice to confirm the point. In *(Robert) Thomas*,[50] we affirmed an MDP conviction for breaking and disas-sembling a vehicle immobilization unit ("boot") from a car after the participants were warned by an off-duty policeman that they were "doing wrong." [51] In addition, a written warning on the windshield of the car stated that the boot was the property of the District of Columbia, and that damage to it would make the offender liable for destruction of property. Concluding that appellants' argument claiming the government failed to establish the malice element was so tenuous that it "merit[ed] little discussion," we held that striking the boot, removing the lug nuts, jacking up the car, removing the wheel with the boot's "jaw" attached, placing it in the trunk, and attempting to put a spare wheel and tire on the car reflected a "showing of actual malice." [52] Similarly, Russell's actions in severing, cutting, and removing the FAA conduit reflected "actual malice." Finally, as we have held with respect to appellant Castoreno's argument, Russell's actions were not justified, excused, or mitigated by appellant's unauthorized agreement with Campbell.[53]

\*　\*　\*　\*　\*　\*

---

46. Criminal Jury Instructions for the District of Columbia, No. 5.400 (5th ed. rev.2011).

47. *Gonzalez v. United States*, 859 A.2d 1065, 1068 (D.C.2004); *(William) Thomas v. United States*, 557 A.2d 1296, 1300 (D.C.1989).

48. *Supra* note 45.

49. See *supra* note 39.

50. *(Robert) Thomas v. United States*, 985 A.2d 409, 412 (D.C.2009).

51. *Id.* at 410.

52. *Id.* at 412, 413. Applying the alternative state of mind defining malice (conscious disregard), we further concluded that "appellants clearly acted with awareness of a plain likelihood that a further particular harm proscribed could occur—and indeed it did occur—when the arm/plate of the boot disappeared after the boot was broken." *Id.*

53. Russell also argues that the trial court committed constitutional error, and in any event abused its discretion, in quashing his request to subpoena a witness Michael Dammeyer, an employee of DOT who worked in the FAA building and was responsible for outside contractors, including I.I.I. According to Russell, if Dammeyer's testimony had been allowed, the court would have had a reasonable doubt about appellants' guilt because the testimony was relevant, material, and corroborative of appellants' testimony. Russell's argument is unconvincing. "[T]he Sixth Amendment does not guarantee criminal defendants the right to compel the attendance of any and all witnesses." *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867 n. 7, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). "A defendant must give some explanation of how the testimony would have been favorable and material, and in ways not merely cumulative to the testimony of available witnesses." *Bardoff v. United States*, 628 A.2d 86, 92–93 (D.C.

For the foregoing reasons, the judgments of conviction on appeal are affirmed.

*So ordered.*

1993) (internal quotation marks and citations omitted). Here, defense counsel merely told the court that "Dammeyer runs all the telecommunications services for the FAA building from his other location at DOT." Based on this proffer, there would have been nothing in Dammeyer's testimony that was material and favorable to the defense without also being cumulative of other defense witnesses' testimony. Dammeyer had not connection or affiliation with appellants, he was not present at the FAA building until after the wires had been cut, and he had no personal knowledge of the deal between Campbell and appellants. The trial court, therefore, administered the law without constitutional error or discretionary abuse.