*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-CM-1593

MICHAEL J. WARNER, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CMD-24360-11)

(Hon. Patricia A. Wynn, Trial Judge)

(Submitted January 22, 2015                    Decided September 17, 2015)

*Regina Michaels* was on the brief for appellant.

*Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *John Hill*, and *Susan M. Simpson*, Assistant United States Attorneys, were on the brief for appellee.

Before GLICKMAN and FISHER, *Associate Judges*, and FARRELL, *Senior Judge*.

GLICKMAN, *Associate Judge*:  Michael Warner was charged by information

with misdemeanor second-degree fraud.[1]  After a bench trial, the trial judge

---

[1] *See* D.C. Code §§ 22-3221 (b), -3222 (b)(2) (2012 Repl.).

acquitted him of that charge but found him guilty of attempted second-degree theft,[2] which the judge concluded is a lesser included offense of second-degree fraud. On appeal, Warner argues that attempted second-degree theft is not included in second-degree fraud, and that, in any event, the evidence and the judge's findings were insufficient to support his conviction of attempted theft. We hold that attempted second-degree theft by means of deception is a lesser included offense of second-degree fraud, and that there was sufficient evidence to support appellant's conviction on that basis. Nonetheless, because we are uncertain whether the judge found an essential element of the lesser included offense, namely, that appellant intentionally or knowingly attempted to deceive, we remand for clarification on this point.

## I.

According to the evidence presented at trial, on October 27, 2011, appellant leased a one bedroom condominium apartment near the campus of American University. A month later, having failed to pay the required security deposit or the first month's rent, he began posting advertisements seeking a roommate on

---

[2] *See* D.C. Code §§ 22-3211, -3212 (b), -1803 (2012 Repl.).

American University housing message boards and Craigslist.com. Appellant did this even though his lease prohibited subletting without his landlord's approval, which he had not secured. At trial, appellant testified that he was unaware of this prohibition in his lease.

On December 2, 2011, Teresa Parks, a junior at American University, saw one of appellant's ads and inquired about the apartment. The ad stated that the unit was available on a "short/month-to-month basis" for "[a]n extended period of time" starting in December. Ms. Parks advised that she was seeking a room for the entire spring semester, i.e., the period from January through May 2012. Responding to her inquiry by email on the afternoon of December 2, appellant stated, "I flexible - short or semester lease." According to appellant, Ms. Parks told him she "wanted a month-to-month lease" starting with the "December/January timeframe," with the possibility of continuing after those first two months if the living situation "work[ed] out." Appellant emailed her a draft month-to-month lease agreement.

Teresa Parks's mother, Vanessa Parks, phoned appellant on December 4 to finalize the deal. Mrs. Parks testified that appellant told her he owned the apartment and that it would be available for rent for "at least the semester." She

told appellant that the preference was for her daughter "to stay for the entire semester, but [they] agreed to a month-to-month lease in case it didn't work out." In other words, Mrs. Parks testified, although the lease would be month-to-month, "the agreement verbally was that assuming everything worked out, [Teresa] would live there for the entire semester, at least."[3]  After the conversation, Mrs. Parks wired $800 to appellant via Western Union as a security deposit to hold the apartment.  Appellant picked up the wired funds at 9:41 a.m. on December 5, 2011, and texted Mrs. Parks to let her know that he had received the money.

Unbeknownst to Teresa and Vanessa Parks, appellant was in communication with someone else interested in his offer of a room for rent.  Nicole Diaz, a senior at American University, called him after seeing his ad on Craigslist.  Their initial conversation apparently took place the night of December 4, after appellant's conversation earlier that day with Mrs. Parks.  Ms. Diaz and appellant exchanged emails on December 5, after appellant had picked up the Parks' $800 security deposit.

---

[3] At some point, Mrs. Parks saw the draft lease agreement that appellant had transmitted, but neither she nor her daughter ever signed it.

Ms. Diaz testified that appellant told her he owned the apartment and had a roommate who would be leaving in December, so that she would be able to move in in mid-January. He also told her he was a businessman who traveled a lot, so she would often have the apartment to herself. At 11:01 a.m. on the morning of December 5, Ms. Diaz emailed appellant that she was "all set to 100% commit to the place." At 11:28 a.m., less than two hours after he picked up the security deposit wired by Mrs. Parks, appellant responded to Ms. Diaz, also by email, that "[t]he place is yours." Ms. Diaz was unaware of appellant's dealings with the Parks family.

Appellant testified that he told Ms. Diaz she could not move in until after January because he had "a prospective roommate" until then. While he had intended to have Ms. Parks as his roommate "for at least two months," she "did not commit to an entire semester" and he expected her to move out after January. "I was hoping to maintain a stream of income so I could pay my rent," appellant testified, "so I was looking for another roommate . . . to come in right after [Teresa] Parks had left."

As things turned out, neither of the subleases under discussion came to fruition. Ms. Diaz became concerned after appellant sent her a follow-up email

proposing a move-in date at the end of January and asking for a deposit of $850 to hold the room. She phoned him to ask why the deposit was $850 when the advertised rent was $800 per month, and whether she could have a mid-January move-in date as they had discussed. According to Ms. Diaz, appellant said the $850 figure was a mistake and that it would be "completely fine" for her to move in to the apartment in mid-January. But as the conversation progressed and she asked other questions, appellant became "very volatile" and "rude," and Ms. Diaz perceived "there was something definitely wrong" with the deal. The next day, December 6, she informed appellant that she was no longer interested in the apartment.

That afternoon, after her daughter informed her of Ms. Diaz's experience, Mrs. Parks telephoned appellant.[4] He denied having had any contact with Ms. Diaz. Mrs. Parks accused him of trying to pull off a scam, and appellant offered to cancel their deal and return her security deposit. Mrs. Parks agreed that would be the best thing for him to do. Appellant said he would wire the money back to her by Western Union.

---

[4] Although the testimony at trial does not make this clear, the prosecutor stated in his opening that Ms. Diaz contacted Ms. Parks after learning about her from appellant's Facebook page.

Appellant never returned the security deposit, however. He testified that he did not do so because "I didn't have a full-time job at the time and I was already in a financial hole. I fully intended to, and I'm the one who offered the money back to Ms. Parks, so once I got a full-time job, I wanted to give her money back, but soon afterwards, this [criminal case] happened."

## II.

After the evidence was in and the parties had delivered their closing arguments, the trial judge stated she needed additional time to review the evidence and would not reach a verdict that day. Three weeks later, when the parties returned to court, the judge announced partial findings but identified additional legal issues for the parties to brief before she could render her verdict. One of those issues concerned the previously unmentioned possibility that appellant might be found guilty of a lesser included offense.

The judge explained that she was unable to find that appellant knew he lacked authority to sublet his condominium unit to Ms. Parks and never intended to make it available to her, as the government contended. Rather, the judge "accept[ed]" appellant's testimony that he expected Ms. Parks to stay in the apartment for two months and then leave at the end of January, making way for

Ms. Diaz to reside there from February onward. Ms. Parks and appellant both understood that her tenancy would be month-to-month, the judge found, "and that there was no promise that it would be for a full semester."

Nonetheless, the judge identified a different possible basis for finding appellant guilty of either fraud or a lesser offense. "The potential fraud," the judge stated, was rooted in appellant's "implied promise" to Ms. Parks that he would not search for someone to replace her as his roommate before the end of the spring semester "unless it turned out that [their arrangement] was not working." As the judge elaborated:

> I am finding that there was at least an implicit promise that there would not be any search for additional tenants. That there was going to be this opportunity to try this arrangement, and that he was not going to exercise his sort of blanket right to terminate this month-to-month lease, that instead there, if everything worked out [Teresa Parks] would have the full semester.

This implicit promise was material to appellant's agreement with Teresa Parks and her mother, the court concluded.

Whether appellant's promise was fraudulent, the judge reasoned, depended on "whether or not *at the time he made that promise* he knew that he was going to continue to look for people. That he knew that he wasn't going to wait to see

whether or not [his arrangement with Teresa Parks] worked out or not." (Emphasis added.) Appellant inquired whether the judge had made a finding on this question and argued that no evidence had been presented on the issue. In response, the judge said "the only evidence" was appellant's negotiation with Ms. Diaz "shortly after" his conversations with Teresa Parks and her mother, from which "one could infer . . . that at the time he entered into this oral agreement he knew that he wasn't going to perform." The judge added, however, that she "did not make a factual finding" on this issue and had "skipped over it because I thought that perhaps I would not have to make that factual finding . . . depending on what the law was."

Having rejected the government's theory of prosecution and identified appellant's implicit promise to Teresa Parks as the potential basis for finding him criminally liable, the judge asked for briefing on the legal issues raised by her analysis. These issues included whether the government had proved all the elements of second-degree fraud and, if not, whether theft in the second degree is a lesser included offense. While the judge expressed doubt as to appellant's guilt of second-degree fraud, she professed to have no doubt about finding him guilty of theft "if that is a lesser included offense," based (the judge said) on the fact that "he took the money and didn't give it back."

After the parties submitted their post-trial briefs, they returned to court on September 7, 2012, to receive the judge's verdict. In a brief pronouncement, the judge acquitted appellant of second-degree fraud for lack of sufficient proof that he had engaged in a fraudulent scheme or systematic course of conduct. However, the judge concluded, appellant was guilty of a lesser included offense, *attempted* second-degree theft. In rendering this verdict, the judge made no additional factual findings; she did not return to the question she previously had left unanswered as to the falsity of appellant's implicit promise to Teresa Parks. Nor did the judge specify the type of theft that she found appellant had attempted to commit.

**III.**

Rule 31 (c) of the Superior Court Rules of Criminal Procedure, captioned "Conviction of a lesser included offense," provides in pertinent part that "[t]he defendant may be found guilty of an offense necessarily included in the offense charged." The "lesser offense must be such that the greater offense cannot be committed without also committing the lesser."[5] Accordingly, "the determination whether an offense is a 'lesser included' offense of an allegedly 'greater' offense is

---

[5] *Lee v. United States*, 668 A.2d 822, 827 (D.C. 1995) (quoting *Crosby v. United States*, 339 F.2d 743, 744 (D.C. Cir. 1964)).

made by comparing the statutory elements of the two offenses. A lesser included offense charge is proper when 'the elements of the lesser offense are a subset of the elements of the charged offense.'"[6] Applying this test, we conclude that, while not every type of attempted second-degree theft is necessarily included in second-degree fraud, one type is: the attempt to commit the offense we have recognized as second-degree theft by deception.[7]

The elements of second-degree fraud are: (1) the accused "engage[d] in a scheme or systematic course of conduct" (which we have interpreted as requiring

---

[6] *Id.* at 826 (quoting *Schmuck v. United States*, 489 U.S. 705, 716 (1989); internal citation omitted).

[7] D.C. Code § 22-3211 (a) groups the different ways in which theft may be committed into three general categories—by "(1) taking or exercising control over property; (2) making an unauthorized use, disposition, or transfer of an interest in or possession of property; or (3) obtaining property by trick, false pretense, false token, tampering, or deception." The first category corresponds to thefts formerly known (at common law and under earlier statutes) as larceny. The second category covers thefts previously prosecuted as embezzlement, larceny after trust, and similar crimes. The third category encompasses thefts committed by means of false pretenses and other forms of deception. We refer generally to the third category as "theft by deception." *See Cash v. United States*, 700 A.2d 1208, 1210-12 (D.C. 1997); *see also Theft*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "theft by deception" as the "use of trickery to obtain another's property," especially by "creating or reinforcing a false impression").

the commission of multiple acts[8]) in furtherance of the fraud, (2) "with intent to defraud or to obtain property of another by means of a false or fraudulent pretense, representation, or promise."[9]  The intended means of commission may be a "false promise as to future performance which the accused does not intend to perform or knows will not be performed."[10]  The "property" that is the object of the fraud can be "anything of value."[11]  It is not an element of second-degree fraud that the accused succeeded in obtaining another's property or causing another to lose property; this is what distinguishes the offense from first-degree fraud.[12]

---

[8] *See Youssef v. United States*, 27 A.3d 1202, 1207-08 (D.C. 2011) ("scheme or systematic course of conduct" must be "composed of at least two acts"); CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA (hereinafter, "CRIMINAL JURY INSTRUCTIONS") § 5.200 ("Fraud") (5th ed. rev. 2014) (scheme or systematic course of conduct requires a "pattern of behavior . . . . more than an isolated act").

[9] D.C. Code § 22-3221 (b).

[10] D.C. Code § 22-3221 (c); *see Hoff v. Wiley Rein, LLP*, 110 A.3d 561, 565 (D.C. 2015) ("A mere 'prophesy or prediction of something' that is 'hoped' for 'or expected to occur in the future is not actionable upon its nonoccurrence.'") (quoting *Bennett v. Kiggins*, 377 A.2d 57, 61 (D.C. 1977)).

[11] D.C. Code § 22-3201 (3); *see also* § 22-3222 (b)(2) ("some value").

[12] *See* D.C. Code § 22-3221 (a) (defining fraud in the first degree as a fraud by which the perpetrator "obtains property of another or causes another to lose property").  In this respect, second-degree fraud can be viewed as analogous to attempted first-degree fraud.

As the trial judge evidently recognized, because wrongfully obtaining or using another's property *is* an element of the completed offense of theft (whether it is committed by deception or otherwise),[13] that completed offense is not necessarily included in second-degree fraud. But *attempted* theft by deception in the second degree may be a lesser included offense, as the government does not need to prove that the attempt succeeded. To prove an attempt to commit second-degree theft by deception, the government must prove only that (1) the accused committed an overt act in furtherance of the offense, (2) with the intent to obtain property of another by "deception," i.e., to use deceptive means to deprive the other of a right to or a benefit of the property or to appropriate the other's property (or a benefit thereof) without authority or right.[14] The term "deception" encompasses "any act or communication made by the defendant which he knows to be untrue or false,"[15] including "any misrepresentation as to the future, as well

---

[13] *See* D.C. Code § 22-3211 (b).

[14] *See Stroman v. United States*, 878 A.2d 1241, 1245 (D.C. 2005) ("To prove attempt, the government must show the intent to commit a crime and the doing of some act toward its commission that goes beyond mere preparation."); *Russell v. United States*, 65 A.3d 1172, 1176-77 (D.C. 2013) (setting forth elements of second-degree theft).

[15] *Cash*, 700 A.2d at 1210 (brackets omitted).

as the past or present."[16]  The property that is the object of second-degree theft can be "anything of value."[17]

Comparing the elements of the two offenses, we see that one cannot commit second-degree fraud without also committing attempted second-degree theft by deception.  As to the *actus reus* element of each offense, the pattern of multiple acts in furtherance of the crime required by the former plainly encompasses the single overt act required by the latter.  And the "intent to defraud or to obtain property of another by means of a false or fraudulent pretense, representation, or promise" that constitutes the *mens rea* element of fraud encompasses the intent to obtain another's property by "deception" and without right that is the corresponding element of theft.  Indeed, despite terminological differences, the *mens rea* elements of each offense appear to be equivalent.[18]

---

[16] *Id.* at 1212; *see also Russell*, 65 A.3d at 1177 ("[I]n order to show that the accused took the property 'without authority or right,' the government must present evidence sufficient for a finding that 'at the time he obtained it,' he 'knew that he was without the authority to do so.'") (quoting *Peery v. United States*, 849 A.2d 999, 1001 (D.C. 2004)).

[17] D.C. Code § 22-3201 (3); *see also* §22-3212 (b) ("some value"); *cf.* § 22-3212 (a) (theft in the first degree is committed where the value of the property obtained or used is $1,000 or more).

[18] *Cf. DiGiovanni v. United States*, 580 A.2d 123, 125-26 (D.C. 1990) (perceiving "no material difference" between an "intent to defraud" and the "intent

*(continued…)*

The fact that the theft statute defines alternative varieties of theft that do not involve obtaining the property of another by deception[19] does not prevent attempted second-degree theft by deception from being a lesser included of second-degree fraud. "[T]hat [a] lesser offense include[s] an alternative not required by the greater offense [does] not preclude it from being a lesser-included offense" so long as one alternative way of committing the lesser offense is a "subset[] of the greater offense."[20]

---

*(continued…)*
to deprive another of the right to the property or a benefit of the property"); CRIMINAL JURY INSTRUCTIONS § 5.200 (B)(2) (restating the *mens rea* element of second-degree fraud as the "inten[t] to deceive or cheat someone or obtain property of another by means of a false representation or promise"); D.C. Council, Comm. on the Judiciary, Report on Bill No. 4-133, the "District of Columbia Theft and White Collar Crimes Act of 1982," at 14 (June 1, 1982) (stating that "the gravamen [of the fraud offense], which distinguishes it from theft, is engaging in a scheme or systematic course of conduct").

[19] Notably, as explained in note 7, *supra*, the theft statute also embraces "the type of theft formerly known as larceny" and "thefts in the nature of embezzlement, larceny after trust, and similar crimes." In addition, the statute applies to wrongfully *using* another's property as well as wrongfully obtaining it. D.C. Code § 22-3211 (a), (b).

[20] *United States v. McCullough*, 348 F.3d 620, 626 (7th Cir. 2003); *accord United States v. Alfisi*, 308 F.3d 144, 152 n.6 (2d Cir. 2002). So, for example, this court has held that one of the alternative forms of simple assault—non-violent sexual touching—is a lesser included offense of misdemeanor sexual abuse. *Mungo v. United States*, 772 A.2d 240, 246 (D.C. 2001).

Because the elements of attempted second-degree theft by deception are a subset of the elements of second-degree fraud, we hold that the former is a lesser included offense of the latter.

## IV.

Appellant further contends that the evidence at trial was insufficient to prove him guilty of attempted second-degree theft, and that the trial judge's findings did not support her determination that he was guilty of that offense. Viewing the evidence, as we must, "in the light most favorable to the prosecution," we are satisfied that a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[21] However, because it appears that the judge may have refrained from finding a critical element of the lesser included offense, we deem it necessary for the judge to augment her findings on remand.

The issue is whether the evidence showed that appellant attempted to obtain the $800 security deposit from Mrs. Parks by deception, i.e., by a material misrepresentation of some kind. The judge found that appellant implicitly

---

[21] *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc) (citations and quotations omitted).

promised that he would make his apartment available to Teresa Parks for the full spring semester if the arrangement proved satisfactory to both of them; in other words, that he had not already made up his mind to evict her in January if he could find a roommate to replace her. The testimony and documentary evidence summarized above supports that finding and the fact that the parties agreed on a month-to-month lease did not disprove it. The evidence also supported the judge's finding that appellant's implicit promise was material to Teresa Parks and her mother, and that they would not have gone forward with the deal (and wired the security deposit) had they known he was continuing to look for a roommate to replace Ms. Parks at the end of January regardless of how well things were going. Finally, the evidence permitted a finding that appellant's promise was false, in that he made it without intending to keep it. As the judge reasoned, this could be inferred from appellant's actual offer of the apartment to Ms. Diaz immediately after he received Ms. Parks's security deposit. "Evidence of a subsequent act, if connected in some material way with the event in question, can be probative of a prior state of mind."[22]

---

[22] *Cash*, 700 A.2d at 1212.

A false promise need not be express to support a conviction for attempted theft by deception; it can be implicit.[23]   Thus, we conclude there was sufficient evidence adduced at trial to permit a finding that appellant committed the offense of attempted second-degree theft by deception.   But that does not conclude our inquiry.

When the trial judge explained how the falsity of appellant's promise could be inferred from his subsequent dealings with Ms. Diaz, the judge also stated—in response to appellant's specific request for a finding on the question—that she had not (at least, not yet) drawn that inference.   She acknowledged that she had not made the critical factual finding that appellant knew he was not going to perform his implicit promise at the time he made it.   The fact that the judge later found appellant guilty of attempted second-degree theft is not enough to assure us that she ultimately did find that he had made a false promise.   The judge may have made that finding *sub silentio*; but she may not have done so, either because she found herself unable to make it beyond a reasonable doubt, or because she erroneously decided that a finding of falsity was not required to convict appellant of attempted theft by deception, or because she overlooked the factual issue.

---

[23] *Blackledge v. United States*, 447 A.2d 46, 49 n.3, 52 (D.C. 1982).

Indeed, it is worth noting that, in finding appellant guilty of attempted second-degree theft, the judge did not specify that it was theft *by deception* or any synonym thereof, and on the record before us, we cannot exclude the possibility that the judge erroneously found appellant guilty of another species of theft arguably shown by the evidence but not included in second-degree fraud or otherwise charged in the information filed against appellant (for example, "making an unauthorized . . . disposition" of the security deposit entrusted to his possession, which he failed to return[24]).

"[W]here a party makes a timely request for special findings and, in the course of the proceedings, identifies with sufficient clarity the matters on which he seeks such findings, the trial judge must articulate findings specific to all issues of fact and law materially in dispute between the parties and fairly raised by the evidence and the party's request."[25]  Appellant made a timely and specific request for a finding as to whether his implicit promise was false (which he disputed). Although he did not renew the request when the judge rendered her verdict, the

---

[24] D.C. Code § 22-3211 (a)(2).

[25] *Saidi v. United States*, 110 A.3d 606, 614 (D.C. 2015); *see* Super. Ct. Crim. R. 23 (c).

issue had been clearly and fairly raised for the judge's consideration, and she was obliged to make the findings necessary to resolve it.[26]

We hardly need add that even if "the evidence may be sufficient to sustain [appellant's] conviction, it does not compel it."[27] Where the evidentiary record is sufficient to support the verdict in a bench trial, but the findings of fact underlying the verdict are insufficient, we therefore have deemed it appropriate to remand for the judge to augment those findings as necessary to clarify whether the verdict can stand.[28]

Thus, we remand this case to the Superior Court for the trial judge to make the appropriate findings clarifying whether the government proved beyond a reasonable doubt that appellant's implicit promise to Teresa and Vanessa Parks was false—i.e., that when he made it, he did not intend to keep it or knew he would not keep it—and for such further proceedings as may be necessary thereafter. If

---

[26] *Cf. Saidi*, 110 A.3d at 615.

[27] *Lihlakha v. United States*, 89 A.3d 479, 490 (D.C. 2014).

[28] *See Saidi*, 110 A.3d at 615; *Lihlakha*, 89 A.3d at 490-91; *Foster v. United States*, 699 A.2d 1113, 1115-16 (D.C. 1997); D.C. Code § 17-306 (2012 Repl.) ("The District of Columbia Court of Appeals may . . . remand the cause and . . . require such further proceedings to be had, as is just in the circumstances.").

the trial judge is unavailable or unable for any other reason to make the findings necessary to clarify whether the government met its burden of proof, the deficiency of the record in its current state will require vacatur of appellant's conviction.

*So ordered.*