*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CM-323

ROMAN L. WILEY,
a/k/a KAMAAL MUMIN,
APPELLANT,

V.

UNITED STATES OF AMERICA, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2018-CMD-16162)

(Hon. John Ramsey Johnson, Trial Judge)

(Submitted November 20, 2020                    Decided December 23, 2021)

*Omar Bississo* was on the brief for appellant.

*Jessie K. Liu,* United States Attorney at the time the motion was filed, and *Andrea Antonelli*, *Elizabeth Trosman*, and *Chrisellen R. Kolb*, Assistant United States Attorneys, filed a motion for summary affirmance for appellee.

Before MCLEESE and DEAHL, *Associate Judges*, and RUIZ, *Senior Judge*.

Opinion of the court by *Associate Judge* DEAHL.

Opinion by *Associate Judge* MCLEESE, concurring in part and dissenting in part, at page 26.

DEAHL, *Associate Judge*: Roman Wiley entered a house that was not his. There is no dispute Wiley sincerely believed the house belonged to him, but the evidence was conclusively to the contrary. He had entered the same house without permission many times before, only this time he also changed the locks on a wrought-iron gate securing its back door. He was convicted of unlawful entry and malicious destruction of property, namely, the locks he removed from the gate. Wiley now appeals his convictions and argues there was insufficient evidence to support them.

As to the unlawful entry count, Wiley argues his genuine belief that he owned the house negates the requisite intent for that offense. Because there was ample evidence to conclude his belief was unreasonable, however, we disagree and affirm his unlawful entry conviction. As to the malicious destruction of property count, Wiley argues the evidence did not show that he damaged the locks, but instead merely that he removed them by unfastening the two screws that kept the locks affixed to the gate's housing. To the extent he damaged the locks beyond merely removing them, Wiley argues the evidence does not support a finding that he did so with the "malice" required by D.C. Code § 22-303 (2012 Repl.). We agree with him

that the evidence of malice was insufficient and therefore reverse his conviction for malicious destruction of property.

## I.

In February 2018, Dinesh Tandon purchased a residential property located at 4891 Colorado Avenue, N.W. The property had once been the site of the Embassy of Congo, though it had been vacant for some time, and Tandon replaced all the locks and hired contractors to repair the house. Tandon was not living there during the repairs but visited frequently to monitor the contractors' progress. One day about a month after he purchased it, Tandon saw somebody (whom he later identified as Wiley) exit the house's basement. Tandon did not confront him at the time and assumed he had been squatting there while the house was vacant. Months later, a contractor called Tandon and reported that he had seen the same man on the property again. Tandon went to the house, but Wiley was gone by the time he arrived. On another occasion, Tandon received a call from the electric company about someone manipulating the electricity meter in the house's basement, prompting Tandon to visit his house again. This time he found Wiley inside, so he called the police, but Wiley was gone before they arrived.

On October 9, 2018, Tandon discovered that someone had gained access to his property, only this time they had replaced the locks on some of the house's doors. On the wrought-iron gate securing the back door, the door-handle and lock had been removed, exposing the pre-fabricated holes where they had previously been. Tandon testified that the locks were "damaged" and "broken," though he and the prosecutor used those words interchangeably with the locks having been "changed" and "removed."[1] He did not describe any damage to the locks beyond their removal; there was no mention of any dents, scratches, contortions, or difficulty in reassembling the locks for future operation. Tandon also testified the back door was boarded up from the inside and the ceiling in the house's entryway was damaged. He called the police to report the incident. Officer Perez arrived on the scene with one of his fellow officers and they took photographs depicting the back gate with the lock and handles removed, and the lock assembly scattered on the ground.

---

[1] For instance, Tandon testified: (1) Wiley "broke in the locks. He changed all of the locks"; (2) "[T]he locks were broken. As you see, the locks were missing"; (3) "All of these locks were gone. They were all . . . broken again." The prosecutor likewise asked Tandon about "the damage we discussed," and when asked to repeat the question, he explained he was asking about "the change to the locks." The government likewise uses descriptors like "damaged" and "broken" interchangeably with "changed" and "removed" in its brief on appeal. For example, it describes its Exhibit 2 as "a photograph of the broken lock." Exhibit 2 is a picture of the gate with the locks removed from its housing, but it does not show any apparent damage to the lockset beyond its disassembly.

The next day, Wiley returned to the house and Tandon again called the police, prompting Officer Perez to return. The officer approached to find Wiley sitting on the house's front steps. Wiley did not try to leave or otherwise evade Officer Perez, but instead spoke freely and insisted he owned the house. Wiley said he was at the house the day prior, and he showed Officer Perez some (apparently immaterial) paperwork purporting to document his ownership of the house. He also explained he was now there to replace the front gate's locks because somebody else kept "coming in behind [him], breaking in and changing the locks," seemingly referring to the new locks Tandon had put on the house. Wiley showed Officer Perez a still-packaged lockset and indicated he was planning to change the front gate's locks with the screwdriver he had in his backpack, which he also showed to Officer Perez. After more discussion during which Wiley could not substantiate that he owned the house, Officer Perez arrested him.

Wiley was charged with one count of unlawful entry on private property, in violation of D.C. Code § 22-3302(a)(1) (2012 Repl.), and one count of malicious destruction of property, "that is, door locks," in violation of D.C. Code § 22-303 (2012 Repl.). After Wiley was found competent to stand trial, the case proceeded to a bench trial before the Honorable J. Ramsey Johnson. Tandon and Officer Perez testified for the government, detailing the facts outlined above. The government

also introduced Officer Perez's body-worn camera footage, capturing his conversation with Wiley, and two relevant photographic exhibits (which are appended to this opinion): one photograph of the back gate with its locks removed, and another of the gate's locks disassembled on the ground.

Wiley testified in his defense that he owned the house. He admitted to switching out the locks, explaining that he used a screwdriver to "unscrew the screws out" and then took "the cylinders out" and put "new cylinders and locks" in their place. Wiley also had this exchange with Judge Johnson:

> The Court: How did you change the locks?
>
> The Witness: With a screwdriver.
>
> The Court: Just undid it?
>
> The Witness: Un-huh. Once I got in there. . . You see this piece here? The screw come out of there, like right there.

He explained that he changed the locks for his own safety because he "didn't know" who had put new locks on the house "or how they kept coming in and out of the place." He otherwise denied damaging the property in any way.

Wiley acknowledged that he had previously been charged with unlawfully entering the same residence. *See* Information, *United States v. Wiley*, 2017 CMD

017365 (D.C. Sup. Ct. Oct. 10, 2017) ("*Wiley I*").[2]  He testified that the trial court had imposed a stay-away order in that matter, but later lifted it, allowing him to "return back to that address."  The dismissal and dissolution of the stay-away order apparently meant, to Wiley, that he "owned the shit."  When asked if he had any records demonstrating his property ownership, he responded somewhat incoherently, but seemingly in the negative.

Closing arguments were brief.  The government stressed that Wiley "had no good faith basis to believe that that property was his," and "admitted that he removed the locks."  The defense countered by stressing Wiley's seemingly genuine belief that the house was his, and that "he didn't destroy" the locks, but "just took them off and placed his own locks on there."  The government rebutted that "there's no good faith exception to destruction of property.  It's simply that the property was not his and he destroyed that property, acting voluntarily, which the elements have all shown beyond a reasonable doubt that he did."

---

[2]  The government ultimately dismissed the matter.  *See Wiley I*, 18-CO-813, *1 (D.C. Sept. 26, 2018).  The unlawful entry alleged in that case preceded Tandon's purchase of the property.

Judge Johnson found Wiley guilty on both counts. In a short oral ruling, he explained:

> Both offenses are simple and straight forward offenses and somehow Mr. [Wiley] has the idea that this is his house, but it's not his house . . . Mr. Dinesh Tandon made it very clear that it was his house. He's the one who bought it. He's the one who is fixing it up.

Judge Johnson added that he did not "really think [Wiley] lied" about owning the house, rather he "has a deeply held belief that it's his property," but is simply "wrong" about that. He sentenced Wiley to concurrent terms of 180 days of imprisonment, suspended as to all but 30 days, and 18 months of supervised probation. As a condition of probation, the court required him to submit to a mental health screening followed by treatment. Wiley then timely filed this appeal.

## II.

Wiley challenges the sufficiency of the evidence as to both his unlawful entry and his malicious destruction of property convictions. We review sufficiency challenges de novo. *Nero v. United States*, 73 A.3d 153, 157 (D.C. 2013). In doing so, we "review the evidence in the light most favorable to the verdict, giving full play to the right of the fact-finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Roberts v. United States*, 216 A.3d 870, 882

(D.C. 2019). "A court must deem the proof of guilt sufficient if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)).

**A.**

We first examine Wiley's challenge to his unlawful entry conviction. Under the statute, "[a]ny person who, without lawful authority," enters a private dwelling "against the will of the lawful occupant" commits an unlawful entry. D.C. Code § 22-3302(a)(1). The offense has five elements: (1) the defendant entered or attempted to enter a private dwelling, (2) voluntarily, on purpose, and not by mistake or accident, (3) without lawful authority, (4) the entry or attempt was against the will of the person lawfully in charge of the premises, and (5) the defendant knew or should have known they were entering against that person's will. *Ortberg v. United States*, 81 A.3d 303, 309 (D.C. 2013).

Wiley challenges the sufficiency of the evidence only as to the fifth element, that he knew or should have known he was entering against the rightful owner's will. This element is not satisfied if the defendant held a reasonable, bona fide belief of

their right to enter the premises, *Gaetano v. United States*, 406 A.2d 1291, 1293 (D.C. 1979) (collecting cases), and Wiley contends the evidence established he had such a belief. But we have made clear that "[a] bona fide belief must have some justification—some reasonable basis." *Ortberg*, 81 A.3d at 309 n.12 (quoting *Smith v. United States*, 281 A.2d 438, 439 (D.C. 1971)). There must be, for instance, evidence that "the individual had no reason to know that he was trespassing on the rights of others. Perhaps the individual could reasonably believe that he had title or a possessory interest in the land, or that the land was publicly owned, . . . [or] that he was invited onto the land." *Gaetano*, 406 A.2d at 1294.

There was sufficient evidence for the trial court to conclude that, however Wiley came to believe that he owned the house, his was not a reasonable belief. While the trial court found his belief was sincere and "deeply held," the evidence was more than adequate to prove beyond a reasonable doubt that it was unfounded and unreasonable. First, there was overwhelming evidence that Tandon in fact owned the property and that nobody gave Wiley permission to be there. Wiley did not rebut that evidence by suggesting, for instance, that anybody other than Tandon had given him permission to be there. Second, assuming Wiley's belief was sincerely held, there was evidence that he himself recognized it to be unreasonable, or at least unlikely to be accepted by others. When Tandon or members of his

construction crew approached Wiley, he would typically leave the premises. Third, Wiley had no documentation to support his asserted ownership, and the only apparent basis for his belief that he owned the house was that the government had once dismissed a charge against him for unlawfully entering it, *see Wiley I*, *supra*. While he apparently interpreted the government's decision to dismiss that case and lift the stay-away order against him to mean that the property was his, that is not a reasonable conclusion in light of all the contrary evidence.

It is not clear on the record before us why the government dismissed that earlier charge, but a reasonable person would know there are a variety of reasons why it might have done so short of Wiley being the property's rightful owner. For instance, it might have simply decided the misdemeanor charge was not worth the time and resources to prosecute, even had the evidence against Wiley been overwhelming. Wiley did not offer any evidence or explanation why such a dismissal of a criminal charge prompted him to believe that he owned the house, providing no reason to deem that belief reasonable where he had no other basis for it and the evidence conclusively established that the house was owned by Tandon and nobody gave Wiley permission to be there. Because the evidence sufficiently established that Wiley's belief that he owned the house was not reasonable, we affirm his unlawful entry conviction.

**B.**

Wiley's challenge to his malicious destruction of property conviction presents a more difficult question. The elements of malicious destruction of property under D.C. Code § 22-303 are: "(1) the defendant damaged or destroyed, or attempted to damage or destroy, property; (2) the property belonged to another person; (3) the property had some value; (4) the defendant acted voluntarily and on purpose, and not by mistake or accident; (5) the defendant acted with the intent to damage or destroy the property or despite knowing that his or her conduct created a substantial risk of harm to the property; and (6) the defendant acted without justification, excuse, or mitigating circumstances." *Gore v. United States*, 145 A.3d 540, 544 (D.C. 2016).

The only property the government maintains Wiley damaged or destroyed were the locks he removed from the back gate. It does not contend the gate itself was damaged. Wiley concedes that the government established the second through fourth elements above. But he contends it failed to prove the first element, "that Wiley actually damaged the locks" he removed, and likewise failed to prove the fifth and sixth elements, which we frequently refer to collectively as the "malice" element of the offense. *See, e.g.*, *Guzman v. United States*, 821 A.2d 895, 898 (D.C. 2003)

(defining "malice" as the requisite intent absent "justification, excuse, or recognized mitigation"). We address those arguments in turn.

## 1.

As to the damage element, Wiley asserted in closing that "he didn't destroy" the locks, "[h]e just took them off," and he reiterates on appeal that there was insufficient evidence "that the replaced locks were even damaged." The government's response both at trial and on appeal is that removal itself constitutes damage to the locks. It does not describe any manner in which the locks were damaged beyond their having been removed from the gate's housing. To the contrary, the government stressed in its closing argument that Wiley was guilty because he "admitted that he removed the locks." On appeal, it again emphasizes its theory that Wiley is guilty because "he was the person who removed the locks. Indeed, he concedes that he was the person who did so in his brief." There is no doubt about that, but it is non-responsive to Wiley's repeated assertions that mere removal of the locks does not amount to damage under the statute.

These battling assertions raise an interesting issue, which neither the trial court nor the parties have engaged, about when taking apart an object amounts to damaging it under § 22-303. The statutory text does not shed much light on the

issue, as it applies to "[w]hoever maliciously injures or breaks or destroys, or attempts to injure or break or destroy, by fire or otherwise," another's property. D.C. Code § 22-303. All we can glean from that is a series of synonyms, and each simply raises the same question: whether disassembling something "injures," "breaks," or "destroys" it.

We have one precedent that has touched on the topic, though neither party cites to it. In *Thomas v. United States*, the defendants were convicted of malicious destruction of property after they disassembled a "boot" affixed to a car's tire so as to disable the boot and free the car. 985 A.2d 409, 410 (D.C. 2009). We agreed with the trial court's ruling that they had indeed damaged the boot, despite their arguments that it might have been reassembled had, counterfactually, all of its parts been recovered. *Id.* at 411-12. Relevant to our assessment was the extreme difficulty of disassembling (and ultimate impossibility of reassembling) the boot, composed of a "jaw," an "arm," and a "plate large enough to cover the lug nuts of a wheel so as to prevent anyone from loosening the[m]." *Id.* at 410. The boot was specifically designed "so as to prevent anyone from loosening the lug nuts to remove the wheel" and to "prevent[] removal of the boot" except by use of a key. *Id.* Yet, despite that design, the defendants were among a "group of about five men" who used a crowbar and a sledge hammer "to pry off" enough of the boot's plate to expose the wheel's

lug nuts, and "jack[ed] up the car," "removed the tire and wheel from the car," and placed the wheel "with the jaw attached, into the trunk of the" car. *Id.* at 410-11. In affirming the convictions for malicious destruction of property, we reasoned that the disassembled boot was like "broken human arms," where the damage might be mended and is perhaps only "temporary, but nevertheless substantial." *Id.* at 412. And we stressed that the boot's "arm and attached plate disappeared from the scene and, so far as the record shows, were not discovered again" so that "this particular 'boot' was put out of service indefinitely." *Id.*

As *Thomas* indicates, and reason confirms, whether an item is destroyed or damaged by its disassembly very much depends on its design and the ease with which it can be reassembled. For instance, if somebody took the bottom off of a flashlight and removed its batteries, we would not describe the flashlight as having been destroyed or damaged where it is designed to be disassembled in that precise manner. Nor would we say that removing the top of a salt shaker destroys it, removing a hose from its spigot damages the hose, or removing the spring-loaded roller to replace a roll of toilet-paper injures the holder. Conversely, if somebody dismantles a car's engine or a computer down to its component parts, we might—at least in some circumstances—liken that to the boot we discussed in *Thomas*, where the loss of functionality is "temporary," but "significant" and "substantial." *Id.* at

412; *see Kuebel v. State*, 446 P.3d 179, 187 (Wyo. 2019) (motorcycle was not "'merely' disassembled" for purposes of a similar destruction of property offense where it had been "intact when [its owner] left it, and it was disassembled and lacking essential parts when it was located," costing "between $10,000-$15,000 to repair"). There are no doubt hard cases, and a lockset surely falls somewhere between the hypotheticals above—it is more akin to taking a door off of its hinges by removing its hinge pins, or a tire off of a car by removing its lug nuts. But as with those examples, the lockset described here falls on the side of the ledger where its mere removal did not amount to its destruction or damage under § 22-303.

The evidence at trial was that the locks were easily disassembled and might just as easily have been reassembled, and unlike in *Thomas*, no evidence suggests any of the locks' component parts had "disappeared." 985 A.2d at 412. Wiley testified about how he replaced the locks: "I unscrewed the screws. Took . . . the cylinders out. And I put new cylinders and locks [on]." He "[j]ust undid" the locks by taking the screws out. Wiley even showed Officer Perez the screwdriver he presumably used to do it, and the government has never called into doubt his description of how easily he removed the locks. It stands to reason that the locks could have been reinstalled with the same ease by putting the screws back in place, perhaps in a matter of seconds for all one might infer from the evidence. Door and

gate locks are of course not designed to be easily removed from the outside, but so long as one has access to the interior side of the door or gate—as Wiley seemed to have here—assembly and disassembly is often a simple matter of affixing or removing a couple of screws. A typical lockset, like the one Wiley showed Officer Perez still in its packaging, comes disassembled because its two main parts need to be fitted together through opposite sides of the door's housing. The quick and easy disassembly (and, inferentially, reassembly) mechanism described, without refutation, leads us to conclude that the removal of these locks did not by itself constitute damage or destruction under § 22-303.

Though we think the government is mistaken to equate the locks' disassembly and removal with their having been damaged, that does not end this inquiry because there was some, albeit limited, evidence of actual damage beyond that. One of the government's photographic exhibits (Exhibit 3) seems to show some damage to components of the disassembled locks that Wiley left on the ground. *See* Appendix. While neither the government nor Tandon have ever described any damage depicted in that picture beyond the locks' mere disassembly, giving full leeway to the factfinder as we must on sufficiency review, we think a rational factfinder could conclude that one or more of the locks' components were dented or contorted beyond their mere disassembly. Whether a rational factfinder could conclude that Wiley

inflicted any such damage with the requisite malice is a separate question, which we turn to now.

**2.**

In order to prove the malice prong of malicious destruction of property, it is not enough for the government to show that a defendant intended "to do the act of destruction itself." *Russell v. United States*, 65 A.3d 1172, 1182 (D.C. 2013). The defendant must also have "an enhanced intent to cause the particular harm" done, and lack any "justification, excuse, or recognized mitigation."[3] *Id.* at 1182, 1184. The requisite enhanced intent may take the form of either "actual intent to cause the particular harm which is produced or harm of the same general nature," *id.* at 1184, or "a conscious disregard of a known and substantial risk of the harm which the statute is intended to prevent." *Id.* at 1183 (quoting *Charles v. United States*, 371 A.2d 404, 411 (D.C. 1977)).

---

[3] While Wiley suggests his belief that he owned the house constitutes recognized mitigation, he does not develop the argument, nor do we have any occasion to reach it as we conclude the evidence of malice was insufficient without regard to any potential defense or mitigation.

The parties' central disagreement is whether Wiley's purposeful removal of the locks satisfies the malice element. Wiley contends not, arguing that the evidence was insufficient to demonstrate malice "when he only 'changed' the door locks," and "was not acting maliciously when he replaced the locks on the doors to what he thought was his property." The government does not take issue with the factual premise that Wiley intended only to change the locks in the manner described, but instead asserts that is enough to satisfy the malice prong. In its view, because Wiley "removed the property (i.e., the locks) belonging to the lawful owner, he acted with the requisite malice," and it further stresses that Wiley "concedes that 'he acted intentionally' when he used a screwdriver to remove the locks." But the government's view rests on a premise that we have already rejected—(1) that mere removal of the locks amounts to damaging them, so that (2) their purposeful removal equates to malice. That is a false equivalence at both steps. Just as mere removal of the locks does not equate to destroying them, the purposeful removal of the locks does not equate to malicious destruction.

The evidence did not permit a conclusion that Wiley acted with an intent to damage the locks beyond their removal, or with a reckless disregard of a "strong likelihood that such harm" would result from his actions. *Guzman*, 821 A.2d at 898. The evidence shows only that Wiley removed the locks, and did so in a manner

consistent with an intent to secure, not to damage, property he considered to be his. He did not break the locks off with a hammer, pry them off with a crowbar, or melt them down with a blowtorch. He instead removed the locks' screws in the precise manner that screws are designed to be removed: using a screwdriver. Because the manner in which Wiley removed the locks evinced no intent to damage them beyond their removal, or any reckless disregard of a substantial risk that he would do so, there was insufficient evidence to show that any damage to the locks was inflicted with the requisite malice.

That result is compelled by *Harris v. United States*, which concerned a defendant who repeatedly attempted to kick in the door of a residence he shared with others and thereby damaged it, cracking a door panel, the door frame, and bending the hinges. 125 A.3d 704, 710 (D.C. 2015). Because the evidence was "in equipoise" as to whether the defendant intentionally damaged the door or, instead, intended only to gain access to the property, we concluded the evidence was insufficient to find that he intentionally damaged the property. *Id.* at 708-09. We also concluded the evidence was insufficient to support a finding that he acted recklessly, because the significant damage he caused to the door through repeatedly kicking it was not enough to show anything beyond mere negligence. *Id.* at 710. Negligence does not satisfy the mens rea element of this offense. *Id.*; *Gonzalez*, 859

A.2d 1065, 1067-68 (D.C. 2004).  If repeatedly kicking a door with an intent to force it open is insufficient to support a finding of malice, it follows that removing door locks with a screwdriver cannot support a finding of malice even if some damage results.  The government needed some evidence that the damage was intentionally caused, or inflicted in a reckless manner, and that was missing here.

The government counters with *Russell v. United States*, where we established that a defendant who purposefully destroys property under the mistaken but unreasonable assumption that he has permission to do so is guilty of malicious destruction of property.  65 A.3d 1172, 1176, 1182 (D.C. 2013).  But in *Russell* there was no dispute that the defendants "'*voluntarily and on purpose*,' had damaged property of 'some value' that 'was not theirs.'"  *Id.* at 1184 (emphasis added).  They very deliberately "sever[ed] and cut[]" telephone cables and sold them to a recycling center, albeit under the mistaken (though unreasonable) belief that they had permission to do so.  *Id.* at 1185-86.  There is no similar evidence here that Wiley intended to damage the locks beyond their mere removal.

The dissent offers three reasons why it disagrees with this conclusion (its points 3, 5, and 6, respectively).[4] In summary, they are (1) that we are wrong to treat Wiley's description of how he removed the locks as accurate, (2) instead we can infer that he "pried off multiple parts of the locks and that the damage he caused was visible to him as he was doing so," so that (3) his act of continuing to remove the locks despite the posited visibility of "substantial bending of the locks' parts" constituted malice because the inflicted "damage would have been obvious to Mr. Wiley as he was" removing the locks and yet he did not desist. Those are not reasonable inferences gleaned from the record, but mere suppositions. The dissent

---

[4] Half of the dissent's six points (points 1, 2, and 4) are dedicated to a topic on which we agree: that there was sufficient evidence of damage to the locks. The gist of these more academic disagreements is that the dissent reads the government's and Tandon's repeated references to the locks being "damaged" and "broken" as referring not just to their removal, but to whatever dings and dents we ourselves can glean from Exhibit 3. The problem with that inference is that all indications are to the contrary. The government and Tandon consistently referred to the locks' removal and disassembly as the pertinent damage, as detailed *supra* note 1, and have never once described any other type of damage. For instance, the government on appeal points us to Exhibit 2 as "a photograph of the broken lock," yet that photograph shows only a picture of the gate with the locks having been removed, and no hint of actual damage to the locks (a point the dissent does not dispute). The government's consistent response to Wiley's challenges that the locks were not damaged beyond their removal has been, to paraphrase, "removal itself is enough," and never, "but there's more." While the dissent dismisses these problems with an acknowledgement that the government's arguments "could have been more concrete," there is nothing abstract about the government's argument. It is simply limited to the position that disassembly alone is the relevant damage.

"cross[es] the bounds of permissible inference and enter[s] the forbidden territory of conjecture and speculation." *Rivas*, 783 A.2d at 134 (citation omitted).

To respond to the dissent's points 3, 5, and 6, in turn: First, the government itself endorses Wiley's explanation of how he removed the locks and presented no evidence to the contrary, so we see no reason to second-guess the parties' joint account of what occurred. The government's ostensible coup de grâce in arguing that the evidence supported a finding of malice is Wiley's own description of what he did. It argues "there was ample evidence" of malice precisely because of Wiley's own explanation "that he used a screwdriver to change the locks and demonstrated which screw[s] he loosened by point[ing] to a photograph of the broken lock depicted in Government's Exhibit Two"—an exhibit that (again) shows no damage beyond the locks' removal.[5] To the limited extent the trial court commented on

---

[5] This is a recurring theme in the government's brief, where it embraced Wiley's testimony of how he removed the locks in an effort to turn it against him, concluding that "[b]ecause [Wiley] removed the property (i.e., the locks) belonging to the lawful owner, he acted with the requisite malice." Its brief is content to rely on that description and never once suggests some alternative mechanism for how Wiley removed the locks, no doubt because there is no evidence supporting an alternative account. Perhaps the government could have elicited testimony that the damage to the locks was at odds with Wiley's description of how easily he removed them, if that were in fact the case. It never did.

Wiley's credibility, it was to credit his sincere and "deeply held belief" that the property was his, casting no doubt on his account of how he removed the locks.

Second, the dissent's account (based largely on a photograph) of how it thinks Wiley in fact removed the locks—that he "pried" them off and that the damage inflicted would have been visible to him "as he was doing so"—is speculative. For instance, even if we rejected Wiley's account of how he removed the locks despite the government's failure to call it into question on appeal, there is no reason to think he did so slowly or that damage would have been evident to him mid-act (as the dissent suggests). Wiley might just as easily have popped the locks off with a jolt, so that the damage would have been apparent only after the fact. Or perhaps he did it slowly but any damage to the components was internal and hidden by the gate's housing until after the fact. The locks were also lying on the ground for a few days after Wiley removed them and before Tandon discovered them, adding yet another plausible explanation for how they came to be damaged (somebody might have simply stepped on them). Ultimately, none of these versions has meaningful support in the evidence, but they are as plausible as the account the dissent offers. *See Harris*, 125 A.3d at 709 ("Where evidence of guilt is in equipoise with evidence of innocence, it is perforce insufficient for conviction by the constitutional standard, beyond a reasonable doubt.").

Third, the dissent's conclusion that Wiley acted with malice depends on this narrative that Wiley saw he was damaging the locks and nonetheless continued to do so. Without that supposition, the dissent cannot distinguish *Harris*, 125 A.3d at 709-10, a precedent it further notes its disagreement with. But it is speculation for the dissent to suggest Wiley pried the locks off in a manner such that damage became evident to him mid-act and he nonetheless persisted. The uncontested description of how Wiley removed the locks, and his expressly credited motivation for doing so (he believed the house was his), preclude a finding that he acted with malice.[6]

### III.

For the foregoing reasons, the Superior Court's judgment is affirmed in part and reversed in part. We remand with directions to enter a judgment of acquittal on the destruction of property count.

*So ordered.*

---

[6] There are undoubtedly instances where the particular damage inflicted will support a finding of malice beyond a reasonable doubt, despite a lack of evidence as to how precisely the damage was inflicted. For instance, imagine a derogatory word or symbol etched into the hood of another's car via some unknown mechanism; that damage alone would surely be sufficient evidence of malice because it is difficult to conceive how it might have been negligently as opposed to intentionally inflicted. But a mangled lockset does not fit within that category. We suspect many homeowners and do-it-yourselfers have attempted to replace locks on their homes and, through mere negligence, mangled some component parts in the process.

MCLEESE, *Associate Judge*, concurring in part and dissenting in part: I agree with the court that the evidence was sufficient to support Mr. Wiley's conviction for unlawful entry. I respectfully dissent, however, from the court's conclusion that the evidence was insufficient to support Mr. Wiley's conviction for malicious destruction of property.

This case seems straightforward to me. As the court acknowledges, *supra* at 8-9, we review the sufficiency of the evidence deferentially. *E.g.*, *Hernandez v. United States*, 129 A.3d 914, 918 (D.C. 2016) ("When assessing whether the evidence at trial sufficiently supports a conviction, we view the evidence in the light most favorable to the verdict and defer to the fact-finder's credibility determination. The evidence is sufficient if any rational fact-finder could have found the elements of the crime beyond a reasonable doubt.") (citation omitted). Applying that standard, I conclude that Mr. Wiley's conviction for destruction of property should be affirmed.

Mr. Tandon testified that the locks at issue had been "damaged" or "broken." A picture of the pieces of the lock (see *infra*) shows what a reasonable factfinder could view as damage in any sense of the term (i.e., multiple parts appear to have been badly bent). *See, e.g.*, *State v. Pierce*, 439 N.W.2d 435, 440 (Neb. 1989)

(dented fender and bent bumper established that defendant caused damage); *People v. Quigley*, 894 N.Y.S.2d 628, 628-29 (App. Div. 2010) (upholding sufficiency of evidence to support conviction for intentionally damaging property, where defendant was apprehended on ladder leaning against church, next to bent and folded copper gutter); *see generally, e.g.*, *Vaughn v. United States*, 93 A.3d 1237, 1245, 1272 (D.C. 2014) (in assessing sufficiency of evidence, court states that jury could reasonably have concluded that video, although of "extremely poor quality," depicted defendant pushing complaining witness). Finally, the nature of that damage – obvious bending of several parts of the locks – would permit a reasonable factfinder to infer that Mr. Wiley at a minimum was aware that his actions created "a substantial risk of harm to the property." *Gore v. United States*, 145 A.3d 540, 544 (D.C. 2016). Although destruction of property has other elements, I do not understand those remaining elements to be disputed in this case. Mr. Wiley's conviction for malicious destruction of property therefore should be affirmed.

I disagree with the court's reasoning in a number of respects.

(1) Although the court acknowledges that we must view the evidence in the light most favorable to the verdict, *supra* at 8-9, it seems to me that the court does not do so on some important points. For example, the court states that Mr. Tandon's

trial testimony used the terms "damaged," "broke," "broken," "removed," "changed," "gone," and "missing" interchangeably. *Supra* at 4 & n.1. The thrust of this point appears to be that perhaps Mr. Tandon meant "damaged," "broke," and "broken" to mean mere disassembly, rather than to refer to structural damage to the locks. In my view, the cited examples do not indicate interchangeable use of terms but rather reflect the use of different terms to refer to different aspects of the situation: the locks were removed from the door; the locks were gone or missing from the door; the locks on the door had been changed; and the locks were broken and damaged. More fundamentally, however, we are required to view any uncertainty on the point in the light most favorable to the verdict. In other words, a reasonable factfinder could conclude that when Mr. Tandon used the words "broken" and "damaged," he was referring to structural damage, not mere disassembly. That is particularly true given that a reasonable factfinder could conclude that the photographic evidence shows structural damage beyond mere disassembly.

(2) The court accurately notes that Mr. Tandon did not himself specify the nature of the damage to the locks. *Supra* at 4, 18. I take as a given that evidence can be insufficient if it is too conclusory or lacking in detail. In assessing the sufficiency of the evidence, however, we must consider the evidence taken as a whole, not each piece of evidence in isolation. *E.g.*, *Bynum v. United States*, 133

A.3d 983, 988 (D.C. 2016).  In my view, a reasonable factfinder could conclude that Mr. Tandon's unelaborated testimony that the locks were broken or damaged was concretely corroborated by the photographic evidence that multiple parts of the locks had been badly bent.

(3)  The court repeatedly assumes the truth of Mr. Wiley's testimony that he unscrewed the locks and did not damage them.  *Supra* at 17, 20-21.  In my view, that assumption is impermissible.  *See, e.g.*, *Bassil v. United States*, 147 A.3d 303, 308 (D.C. 2016) ("Our obligation to view the evidence in the light most favorable to the prosecution almost always commands that we assume that the jury in its assessment of credibility did not believe the defendant's exculpatory testimony, and we must defer to the jury's prerogative in this area.") (brackets and internal quotation marks omitted); *see also, e.g.*, *Rocha-Guzmán v. United States*, 170 A.3d 170, 177 (D.C. 2017) ("We do not, on appeal, make credibility determinations.").  Crediting Mr. Wiley's testimony on appeal is particularly unwarranted in this case, because a reasonable factfinder could conclude that the substantial bending to parts of the locks shown in the photographic evidence contradicts Mr. Wiley's claims that he did not damage the locks and instead merely unscrewed some screws.

(4)    Without explicitly holding that the United States has forfeited any particular point, the court makes a number of statements about the United States's arguments in the trial court and this court. *Supra* at 13-14, 17-19, 22 n.4, 23-24 & n.5. It is true that the United States's arguments could have been more concrete. Nevertheless, the United States in my view adequately presented its position in the trial court and in this court, arguing that Mr. Tandon testified that the locks were broken and damaged, and that the photographic evidence showed damage. Moreover, some of the court's statements about the United States's positions seem to me to be inaccurate or incomplete. For example, the court appears to suggest that the United States's sole position at trial was that Mr. Wiley damaged the locks merely by removing them. *Supra* at 13-14. Similarly, the court states that the United States "has never called into doubt [Mr. Wiley's] description of how easily he removed the locks." *Id.* at 17. The court also suggests that the United States has not disputed that Mr. Wiley intended only to remove the locks by unscrewing them. *Id.* at 19. To the contrary, the United States argued in the trial court that Mr. Wiley had broken the locks and had pried the locks from the door. In this court, the United States repeatedly argues that Mr. Wiley broke and damaged the locks. Although the court suggests that the United States is using the words "damage" and "broke" to mean only that Mr. Wiley removed the locks, *supra* at 4 n.1, 22 n.4, I do not read the United States's argument to be so limited.

(5)  In concluding that the evidence was insufficient to permit the factfinder to reasonably determine that Mr. Wiley acted with conscious disregard of the risk of damage to the locks, the court lists various things that Mr. Wiley did not do: "He did not break the locks off with a hammer, pry them off with a crowbar, or melt them down with a blowtorch." *Supra* at 20.  The court omits from this list an inference that in my view a reasonable factfinder could draw, based on the testimony at trial and the photographic evidence:  Mr. Wiley used a screwdriver first to pry off multiple parts of locks and then to unscrew and remove the locks.  A reasonable factfinder could further infer that Mr. Wiley was aware of the obvious damage he was causing to multiple parts of the locks.  Such conduct seems to me ample to support an inference of conscious disregard of a substantial risk of damage to the locks.

The court concludes that this line of reasoning is speculative.  *Supra* at 23-25.  In support of that conclusion, the court raises some possibilities of its own:  perhaps all of the damage was done at once, or the damaged parts were hidden from Mr. Wiley's view at the time he was damaging them, or someone else later caused the damage by stepping on the damaged parts.  *Id.* at 24-25.  In my view, a reasonable factfinder could conclude that these possibilities were quite unlikely, given the photographic evidence depicting obvious damage to multiple parts of the locks that

(a factfinder could reasonably conclude) would not have been caused simply by stepping on the parts of the locks. I therefore would defer to the factfinder's verdict of guilt in this case. *See generally, e.g.*, *Ochs v. United States*, 258 A.3d 169, 172 (D.C. 2021) ("The evidence . . . need not negate every possible inference of innocence.") (internal quotation marks omitted); *Smith v. United States*, 899 A.2d 119, 123-24 (D.C. 2006) (in upholding sufficiency of evidence, court relies on common-sense inference that jury could have reached based on videotape and photographic evidence).

(6) The court relies on *Harris v. United States*, 125 A.3d 704 (D.C. 2015), *supra* at 21, 25, but I do not view *Harris* as supporting reversal. In finding the evidence of conscious disregard insufficient, the court in *Harris* explicitly relied on evidence that the damage at issue was not visible from the outside of the door, where the defendant in *Harris* was standing. 125 A.3d at 709-10. In the present case, there was no evidence that the substantial bending of the locks' parts would have been invisible to Mr. Wiley. Moreover, as I have already noted, a reasonable factfinder could conclude that it would have been obvious to Mr. Wiley that he was causing damage to several parts of the locks.

Finally, I note that I would be disinclined to give an expansive reading to *Harris*. As the dissent in that case explained, 125 A.3d at 710 (Glickman, J., dissenting), any sane person who is trying to enter an apartment by kicking open a locked door would necessarily intend to damage the door, as the chosen method of achieving the ultimate goal of entry. In my view, the court in *Harris* did not adequately explain its contrary conclusion.

For the foregoing reasons, I respectfully dissent from the court's holding that the evidence was insufficient to support Mr. Wiley's conviction for malicious destruction of property.

# Appendix



